**Donnell THOMAS, Plaintiff-Appellant,**

v.

**Harold CARDWELL, Defendant-Appellee.**

No. 77–2991.

United States Court of Appeals,
Ninth Circuit.

Argued June 8, 1978.

Decided Sept. 8, 1980.

Submitted Jan. 2, 1980.*

---

* This appeal was initially argued and submitted on June 8, 1978. The submission was vacated by Order of this court, dated October 4, 1978 and remanded to the district court with instructions to amend, correct and supplement the record. The appeal was resubmitted by Order of this court on January 2, 1980, with a revised record and additional briefs.

Robert J. Hirsh, Hirsh & Shiner, Tucson, Ariz., for plaintiff-appellant.

Stanley Patchell, Atty. Gen., Phoenix, Ariz., argued, for defendant-appellee; Bruce E. Babbitt, Phoenix, Ariz., on brief.

Before BARNES and HUG, Circuit Judges, and CURTIS, District Judge.**

BARNES, Senior Circuit Judge.

This is an appeal from the district court's denial of appellant's habeas corpus peti-

** The Honorable Jesse W. Curtis, Senior District Judge, Central District of California, sitting by designation.

tion[1] seeking relief from his Arizona state court conviction for the first degree murder of Mason Branch. Background information and details surrounding the crime itself are summarized in two reported cases and, for purposes of economy, will not be duplicated here.[2]

Appellant has raised many challenges as to the State's conduct in prosecuting his case and as to several of the trial judge's rulings. Basically, these objections fall into three groups:

*First,* appellant alleges that the prosecution had arranged a deal with one key witness, Gilbert Alzua, and failed to disclose that material information both prior to and during the trial. Appellant asserts in support of this issue that at his trial: 1) the prosecutor knowingly or negligently solicited false testimony from Alzua in the form of the latter's denial of the existence of any deal; 2) the prosecutor improperly inhibited appellant's cross-examination of Alzua as to the alleged deal; and 3) the trial judge erroneously refused to admit relevant documentary evidence impeaching Alzua's testimony on that issue.

*Second,* appellant claims that the admission into evidence of prior testimony of a second key witness, Lucias Sorrell, deprived the appellant of his sixth amendment right of confrontation. In addition, appellant challenges the manner in which the prosecution was permitted to conduct its examination of Sorrell.

*Third,* appellant contends that the prosecution deprived him of a fair trial by its constant proffering of inadmissible evidence and continual interjecting of groundless objections.

## I. Testimony of Gilbert Alzua

### A. Background

After his arrest, appellant was incarcerated at the Pima County Jail in Arizona pending trial. Also held there at that time was Gilbert Alzua, who was facing an Arizona state embezzlement charge.[3] In addition, Alzua was subject to possible prosecution for aggravated burglary in the Louisiana state courts and for Dyer Act violations[4] in the Louisiana federal courts.

On or about December 15, 1969, Alzua informed police officials that appellant had admitted to him that he had shot Mason Branch in the course of a liquor store robbery. On December 17, 1969, Alzua's preliminary hearing was continued indefinitely subject to call by stipulation of either the State or Alzua's attorney.[5] Deputy County Attorney John Neubauer was in charge of the embezzlement prosecution against Alzua. Horton Weiss was the state prosecutor in appellant's murder case. On February 9, 1970, Alzua was released from jail on his own recognizance.[6]

---

1. *See generally* 28 U.S.C. § 2254.

2. *See* the Arizona Supreme Court's decision affirming the jury verdict against the appellant, *State of Arizona v. Thomas,* 110 Ariz. 120, 515 P.2d 865, 868–69 (Sup.Ct.1973), and this court's decision affirming the denial of a habeas corpus petition filed by one of the appellant's alleged accomplices in the crime, *Skinner v. Cardwell,* 564 F.2d 1381, 1383–84 (9th Cir. 1977), *cert. denied,* 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978).

3. There is no evidence in the record to indicate that Alzua's presence in the Pima County Jail or his contact with appellant was intentionally manipulated by the State in order to circumvent appellant's right to counsel and to obtain incriminating statements from the appellant. Such practices have been called into question by the Supreme Court in *United States v. Hen-*

*ry,* —— U.S. ——, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

4. 18 U.S.C. §§ 2312 and 2313.

5. *See* Clerk's Record of Proceedings in *State of Arizona v. Kearns and Alzua,* Case No. 8080, Justice Court, Tuscon Precinct No. 4, County of Pima, State of Arizona, which is Petitioner's Exhibit No. 5 herein (henceforth referred to as "Record—embezzlement proceedings").

6. The Record—embezzlement proceedings indicates that Weiss, who was appearing in place of Neubauer at Alzua's bail-release hearing, did not oppose Alzua's motion for release on his own recognizance. However, Weiss has stated in the record below that he did oppose that motion. *See* pages 15–18 of Deposition of Horton Weiss taken on May 15, 1976, which is Petitioner's Exhibit No. 3 herein. Weiss's assertion is supported by Sommer's earlier testimony wherein Sommer states that Weiss did

On April 7, 1970, at a preliminary hearing conducted in appellant's case, Alzua's attorney, Ronald Sommer, testified as to the existence of a deal with the County Attorney's Office in connection with Alzua's appearance as a witness for the prosecution at appellant's trial.[7] Sommer stated that the deal was agreed to by both Weiss[8] and Neubauer.[9] Also at that hearing, Neubauer was called as a witness and he denied having reached any firm agreement with Alzua or Sommer[10], although he did admit that he had indicated that the County Attorney's Office was willing to report to whomever Alzua's attorney requested that Alzua had in fact testified.[11]

On April 21 and 22, 1970, Alzua testified as a prosecution witness at appellant's trial. He stated that while in the Pima County Jail he had discussed the robbery and murder with David Williams, one of appellant's alleged accomplices. Supposedly, Williams told Alzua that appellant had killed Mason Branch during the robbery. Later, on December 3, 1979, Alzua first met the appellant during church services. During that

service, Alzua asked appellant if what Williams had told him was true. Appellant purportedly replied "That's the way it came down."[12]

On cross examination, Alzua admitted that he had been convicted of a felony on three previous occasions and that he was currently facing an embezzlement charge in Arizona and other charges in federal court. When asked if the Arizona embezzlement proceedings had been continued indefinitely "for consideration of your testimony here today", Alzua responded: "I don't know for giving testimony, but they are continued indefinitely."[13] Alzua initially stated that he had been released on payment of a bond in the embezzlement case, but later testified that he wasn't sure and that he might have been released on his own recognizance. Alzua also admitted that he asked his attorney, Sommer, to attempt to collect a reward in connection with the appellant's case. However, Alzua consistently denied the existence of a deal whereby, in exchange for his testimony, the State would drop the embezzlement charge and would specifically inform the federal authorities in Louisiana that he had cooperated in appellant's case.[14]

indeed raise some objections at the bail-release hearing as to Alzua's being released on his own recognizance. Pages 1394–95 of Reporter's Transcript of testimony of Ronald Sommer at the April 7, 1970 Preliminary Hearing in *State of Arizona v. Thomas*, which is Petitioner's Exhibit No. 9 herein (henceforth referred to as "Sommer P. H. testimony").

7. Sommer P. H. testimony at 1383–84.

8. Sommer P. H. testimony at 1388.

9. Sommer P. H. testimony at 1390–91.

10. Pages 1465–67 of Reporter's Transcript of testimony of John Neubauer at the April 7, 1970 Preliminary Hearing in *State of Arizona v. Thomas*, which is Petitioner's Exhibit No. 8 herein (henceforth referred to as "Neubauer P. H. testimony").

11. Neubauer P. H. testimony at 1476.

12. Alzua's testimony at trial was substantially the same as his original statement to Detective Angeley which he made on December 17, 1969. *See* Petitioner's Exhibit No. 10. In that statement he indicated that he was willing to testify at appellant's trial and was making the statement without promise of reward.

13. Page 660, Vol. IV of Reporter's Transcript in *State of Arizona v. Thomas*, No. A–17852, Su-

perior Court of the State of Arizona, County of Pima (henceforth referred to as "R.T., Thomas case").

14. From the record, it appears that Alzua was confused at the time of the trial as to the status of any arrangement with the County Attorney's Office. While Sommer allegedly did discuss the deal with Alzua on several occasions, Sommer stated that he was not sure whether Alzua ever understood the arrangement. Page 59 of Reporter's Transcript of the evidentiary hearing on appellant's habeas corpus petition in the district court below, *Thomas v. Cardwell*, No. CIV 75–300 WEC (henceforth referred to as "R.T., Habeas"), and Sommer P. H. testimony at 1396.

Prior to his testifying at appellant's trial, but after Sommer had supposedly told him of the deal, Alzua purportedly met with Weiss and Neubauer separately. According to Neubauer, both Weiss and later he himself informed Alzua that "no promises could be made to him". Neubauer P. H. testimony at 1465–67.

Given the above conflicting responses, it is entirely plausible that by appellant's second trial, Alzua believed that he had no outstanding arrangement with the County Attorney's Office. However, that does not answer the questions of whether a deal was made with Alzua's attorney or whether Alzua's confusion as to the

Alzua also denied that Sommer had told him of the existence of a deal with the State.

On redirect, Weiss asked Alzua if anyone from the County Attorney's Office had made any promise to him or if he had received anything in consideration for his testifying. Alzua responded in the negative to both questions.

Later at the trial, Sommer testified that he had indeed informed Alzua of the deal which he had arranged with the County Attorney's Office and had shown him a letter dated January 21, 1970, summarizing its terms. According to Sommer, the State had agreed to release Alzua on his own recognizance, to dismiss the embezzlement charge whenever asked to do so by Sommer,

and to attempt to intervene with the federal authorities in Louisiana on Alzua's behalf. Sommer stated that he had discussed the terms of the deal with both Neubauer and Weiss.[15]

Finally, at the trial, another witness, Marie Henry, testified that she had encountered Alzua during appellant's preliminary hearing. At that time, Alzua purportedly admitted to her that everything he had said on the witness stand as to his conversation with the appellant was a lie.

Whether the embezzlement charge against Alzua was ever formally dropped is unclear from the record below. However, at appellant's evidentiary hearing on his habeas petition, it was noted that some unidentified person had written on the cov-

---

deal was intentionally created by the members of the County Attorney's Office.

15. Weiss and Neubauer were the only State's attorneys identified in the record below as being involved in the present controversy. As to Weiss, he has consistently denied both ever agreeing to, or having any knowledge of, any deal in exchange for Alzua's testimony. The only evidence to the contrary is Sommer's testimony. Sommer stated that he spoke primarily with Neubauer but remembered one conversation with Weiss at Alzua's bail-release hearing on February 9, 1970. Sommer P. H. testimony at 1385; R.T., Thomas case at 734. At that time, Sommer says he outlined a deal and Weiss agreed to its terms. Sommer P. H. testimony at 1387–88. However, Sommer's testimony on this issue is inconsistent with his other statements. First, he asserted that he had already entered into an oral agreement with Neubauer prior to January 22, 1970. R.T., Habeas at 22. If an agreement had been reached with Neubauer, who was in charge of Alzua's case for the County Attorney's Office, it appears somewhat anomalous that Sommers would seek to arrange a deal with Weiss on February 9th. Second, part of the alleged arrangement was that Alzua would be released on his own recognizance. However, Sommer admitted that Weiss did oppose Alzua's being released on his own recognizance at the bail-release hearing. If Weiss had agreed to a deal, it is not likely that he would act in a manner so inapposite to its terms on the very same day. Third, Sommer has stated that he was never sure if Weiss was aware of the purported arrangement but merely assumed that Weiss "knew what Neubauer knew". R.T., Habeas at 62. While it is clear that by the end of appellant's preliminary hearing Weiss was aware of the dispute as to the existence of a deal, Weiss

testified that he believed Neubauer's version of the story.

Neubauer also consistently denied ever making a firm deal with Alzua or his attorney. However, at appellant's preliminary hearing, Neubauer did admit agreeing to: 1) Alzua's release on his own recognizance, 2) the continuation of Alzua's embezzlement charge, and 3) the willingness of the County Attorney's Office to inform interested parties that Alzua had testified at appellant's trial. As to each, Neubauer gave a plausible justification for his actions wholly apart from any alleged deal. In addition, he stated that he unequivocally informed Alzua that no promises could be made to him. Nevertheless, from our reading of the record, it appears that Neubauer was attempting to encourage Alzua to testify without making any promises to him directly but implying such rewards to his attorney. Neubauer candidly stated his reasons for telling Alzua that no promises could be made to him as follows:

"Q. . . . you wanted to make it clear to Alzua that he had no deal or arrangement with the County Attorney's Office because that would somehow taint his testimony in some manner or fashion?

"A. [Neubauer] Yes. That's what I told him.

\* \* \* \* \* \*

I don't know whether it would affect his credibility as a witness. But, I felt that if he had to testify that some sort of promises had been made to him in return for his testimony, that that would—

\* \* \* \* \* \*

It would detract from the weight of his testimony."

Pages 6 and 11 of Deposition of John Neubauer taken on May 15, 1976, which is Petitioner's Exhibit No. 2 herein.

er of Neubauer's file for the embezzlement case that the charge against Alzua had been dismissed and gave as the reason "used as witness in Div. 4 case A–17852".[16] "A–17852" was the case number of appellant's trial. As to the federal charges against Alzua, they were dismissed on September 15, 1970 by the U. S. Attorney's Office in New Orleans. In the Order of Dismissal, as one of the justifications for that action, it is noted that "defendant had given invaluable information leading to the convictions of hard-core felons in both state and federal jurisdictions."[17] For reasons not apparent in the record, no charges against Alzua were ever filed by Louisiana state authorities.

### B. *Discussion*

█ Since the Supreme Court's decision in *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), it has been consistently held that a deliberate deception of a court and jurors through the presentation by the prosecution of known false evidence is incompatible with "the rudimentary demands of justice". That principle applies when the tainted evidence goes only to the credibility of the witness. As noted by the Court in *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959):

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

Likewise, the principle applies when the prosecutor's case includes perjured testimony and the prosecution should have known of the perjury. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). For example, a new trial is required when a witness, who has received a promise of leniency in exchange for his testimony, testifies to the contrary and the prosecuting attorney fails to correct that misinformation even though the promise was made unbeknownst to him by another attorney in the prosecutor's office. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).[18]

In addition, there may also arise a *Brady v. Maryland*[19] problem as to the state's suppression of material evidence, *i. e.* the existence of a deal with the state which goes to the witness's credibility. *Agurs, supra*, 427 U.S. at 103–04, 96 S.Ct. at 2397; *Giglio, supra*, 405 U.S. at 153–54, 92 S.Ct. at 765–766. As this circuit has stated: "It is well established that the prosecutor has a duty to disclose any promises of leniency made to a witness testifying at trial since any such agreement is relevant to his or her credibility." *United States v. Ramirez*, 608 F.2d 1261, 1266 (9th Cir. 1979). Such suppression or non-disclosure could justify a new trial "irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).

█ However, a new trial is not necessarily automatic merely because tainted evidence has been presented by the prosecution. As noted by the Court in *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766:

> A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue, supra*, [360 U.S.] at 271 [79 S.Ct. at 1178].

A similar showing must be made under the *Brady* test when material evidence is suppressed. *Agurs, supra*, 427 U.S. at 103, 96 S.Ct. at 2397; *Lewis v. Cardwell*, 609 F.2d 926, 928 (9th Cir. 1979); *Flores v. Craven*, 503 F.2d 1030, 1031 (9th Cir. 1974), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).

---

**16.** Petitioner's Exhibit No. 11 herein.

**17.** Petitioner's Exhibit No. 10 herein.

**18.** As noted in *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766:

> The prosecutor's office is an entity and as such it is the spokesman for the Government.

A promise made by one attorney must be attributed, for these purposes, to the Government.

**19.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

This case presents a somewhat unique variation of the above problems. First, there continues to be a dispute as to whether there was in fact a deal or arrangement between the County Attorney's Office and Alzua. The State's attorneys and Alzua have consistently declared that no deal was ever made while Alzua's attorney insists that there was. Second, that dispute surfaced prior to, or at least during, appellant's preliminary hearing.[20] Consequently, appellant's attorney was well aware before the trial that it was the State's position that it had no special arrangement with Alzua.[21] The jury was made aware of the dispute through the defense counsel's questioning of the witnesses. Third, at the trial, Alzua's attorney did testify and described the deal which he had allegedly made with the County Attorney's Office and had reported to Alzua. Thus, the jury was presented with evidence which not only delineated the purported deal and its terms but also impeached Alzua's denial of the arrangement through the statements of his own attorney.

Assuming solely for purposes of this portion of the discussion that a deal was made between Alzua and the County Attorney's Office, the issue becomes whether there is a reasonable likelihood that the jury's judgment of Alzua's credibility could have been more adversely affected by his admission that he had an agreement with the State than by his attorney's testimony that a deal had been made and Alzua was informed of it, when that testimony was in direct conflict with Alzua's previous statements to the jury. *See United States v. Butler*, 567

F.2d 885, 890 (9th Cir. 1978); *Flores, supra,* 503 F.2d at 1031. We do not find it reasonably likely that the former situation (what appellant urges should have occurred) could have diminished Alzua's credibility with the jury any more than the latter situation (what actually did occur).

If, as urged by appellant, Alzua had admitted the existence of a deal and its terms, Alzua's incentive for testifying falsely would have been exposed to the jury. That factor could possibly influence the jury's estimation of his credibility but mainly by implication. *Cf. Napue, supra,* 360 U.S. at 269, 79 S.Ct. at 1177. In comparison, however, Alzua's credibility was more adversely affected by what actually occurred at the trial. Sommer, Alzua's attorney, took the stand and described the details of the alleged arrangement thereby presenting to the jury Alzua's purported self-interest in testifying for the prosecution. As importantly, Sommer's testimony directly contradicted Alzua's prior statements giving rise to the additional inference that Alzua had testified falsely. Given the fact that Sommer had no direct interest in appellant's case and indeed was testifying against his own client's interest,[22] Sommer's evidence would be accorded significant weight by the jury. Thus, at appellant's trial, not only was Alzua's possible self-interest exposed to the jury, but his testimony was impeached by his own attorney.[23] We therefore find what actually transpired at the trial to be more adverse to Alzua's credibility than the scenario which appellant urges should have taken place. A reversal of appellant's conviction is not required on these grounds.[24]

---

**20.** *Compare* Neubauer P. H. testimony at 1460–76 with Sommer P. H. testimony at 1384–96.

**21.** Neubauer, at the preliminary hearing, did testify that the County Attorney's Office was willing to tell parties referred to it by Alzua's attorney that Alzua had indeed testified at appellant's trial. Neubauer P. H. testimony at 1474 and 1476. There is nothing in the record, however, to indicate whether this was evidence of a special arrangement or merely a common practice of the County Attorney's Office extended automatically to all witnesses.

**22.** Alzua might have been subject to perjury charges if what Sommer said at the trial was true.

**23.** This case differs greatly from those cases such as *Napue, supra,* 360 U.S. at 270, 79 S.Ct. at 1177, and *Butler, supra,* 567 F.2d at 890, where the jury was appraised of some, but not all, of the grounds for determining that a witness may have had a self-interest in testifying against a defendant. Here, Alzua and his attorney revealed all of the relevant factors during the course of the trial.

**24.** Despite the fact that appellant's case was not adversely affected, appellant urges that we still consider the aspect of the prosecution's misconduct in this case. After reviewing the record, we do find some evidence of impropriety on the part of the County Attorney's Office, especially the actions of Neubauer. As this

Additionally, appellant contends that he was denied a fair hearing because he was unduly limited in his cross-examination of Alzua by the trial judge and because the judge refused to admit into evidence the clerk's record of the state embezzlement proceedings against Alzua.[25] Appellant's initial argument rests on the judge's sus-taining the prosecution's objections as to four questions addressed to Alzua by appellant's attorney. After a review of the exclusion of those questions, we find the judge's rulings were either correct or not sufficiently significant so as to constitute a denial of appellant's right to effective cross-examination.[26]

circuit has observed: ". . . the Government has ways of indicating to witness's counsel the likely benefits from cooperation without making bald promises . . . ." *Ramirez, supra,* 608 F.2d at 1266 n. 9. Neubauer appears to have engaged in such activity and sought to conceal what he thought were his tacit arrangements with Sommer from being disclosed at appellant's trial.

This circuit has held, in the context of the willful use of false evidence or suppression of material evidence by the prosecution, that: ". . . even though we would not be persuaded that the defendant had been seriously prejudiced, if the prosecutorial conduct was censorable we might reverse a conviction in the interest of keeping the administration of justice beyond the "suspicion of reproach," or, perhaps, as a prophylactic against willful prosecutorial misconduct." *United States v. Gerald,* 491 F.2d 1300, 1303 (9th Cir. 1974); *accord, Butler, supra,* 567 F.2d at 889. Our rule is not mandated on constitutional grounds. Rather, in that context, we are exercising our supervisory powers over the administration of justice in the federal courts. Based on that rule, we might be inclined to reverse if the prosecutorial misconduct here had occurred in the context of a federal prosecution.

But the present case stems from a habeas corpus petition from a state conviction involving Arizona state prosecutors. In this situation, a federal court does not have broad supervisory powers over the administration of justice in the state court. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Instead, a federal court can only reverse if it finds that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Such a finding does not rest upon the good or bad faith of the prosecution since the goal "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady, supra,* 373 U.S. at 87, 83 S.Ct. at 1197. The following language in *Agurs, supra,* 427 U.S. at 110, 96 S.Ct. at 2401, is instructive:

Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. . . . [N]o purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor. [Footnote omitted.]

Given our prior finding that appellant's case was not adversely affected by the alleged improprieties of the State's attorneys, we are precluded from granting appellant's request for relief on the basis of the mere presence of prosecutorial misconduct without any concomitant prejudice to the accused.

25. Petitioner's Exhibit No. 5 herein.

26. The first challenged question was:

"Q. Isn't it true, Mr. Alzua, that on the day you told the police that you would testify against Petitioner, the charges pending against you were dropped?"

R.T., Thomas case at 658. The prosecution objected on the grounds of appellant's failure to establish a foundation for the question. The objection was properly sustained for that reason. *See generally* Rule 19.3(a) of the Arizona Rules of Criminal Procedure, and *DeElena v. Southern Pac. Co.,* 121 Ariz. 563, 592 P.2d 759, 763–64 (Sup.Ct.1979). In addition, from the record it is clear that the correct answer would have been "no" since the embezzlement charge was not dismissed on the day referred to.

The second question was:

"Q. The charges regarding the theft by embezzlement, when do you know, to your knowledge, is the next court appearance for you?"

R.T., Thomas case at 688. Since Alzua had already testified that the embezzlement proceeding had been continued indefinitely, *id.* at 660, we fail to see the significance of appellant's further inquiry on this point.

The third question was:

"Q. Isn't true, Mr. Alzua, that while you were incarcerated in the Pima County Jail, you went to Minnesota to be a prosecution witness in a case there?"

R.T., Thomas case at 681. Appellant failed to establish any foundation linking Alzua's alleged activity in Minnesota with any aspect of appellant's case. Moreover, Alzua later answered appellant's inquiry when he testified that he had not been a prosecution witness in the last ten years. R.T., Thomas case at 689.

The fourth question was:

"Q. Isn't it true, Mr. Alzua, that you were an informer for the police department for the City of Tucson?"

As for the refusal to admit the record of the embezzlement proceedings, the principal evidentiary value of that document was to show that Alzua had been released on his own recognizance and that his case had been continued subject to call by stipulation of the State of Alzua's counsel. The fact that the embezzlement proceeding had been continued indefinitely was established at trial by the uncontroverted testimony of both Alzua[27] and Sommer.[28] Alzua's release on his own recognizance was established partly by the testimony of Alzua himself[29] but primarily by Sommer's testimony.[30] We agree with the Arizona Supreme Court on this issue that, while the record was admissible and should have been admitted into evidence, appellant was able to get that information before the jury. *State of Arizona v. Thomas*, 110 Ariz. 120, 515 P.2d 865, 873 (Sup.Ct.1973). Any error was cured by the admission of other evidence on the same facts. *United States v. Hendrix*, 549 F.2d 1225, 1231 n. 5 (9th Cir.), cert. denied, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *United States v. Holley*, 493 F.2d 581, 583–84 (9th Cir.), cert. denied, 419 U.S. 861, 95 S.Ct. 112, 42 L.Ed.2d 96 (1974).

## II. *Testimony of Lucius Sorrell*

### A. *Background*

Lucius Sorrell was another key prosecution witness. Sorrell initially testified at a December 9, 1969 preliminary hearing in appellant's case and at appellant's first trial, on or about March 5, 1970, which ended in a hung jury. On both occasions he gave similar testimony which was adverse to the defense. Appellant's attorney at that time,

Jerold Cartin, was present at both proceedings. Cartin had full opportunity and did cross-examine Sorrell.[31] Cartin also represented appellant at his second trial which resulted in the jury verdict against him.

When called to testify at the second trial, Sorrell was recalcitrant, non-responsive and extremely disoriented. He claimed that he did not remember the events surrounding the crime, the appellant, or the other men allegedly involved in the robbery and murder. Nor could he recall ever having testified against the appellant. Sorrell did state that he was a heavy drug user and was currently residing in a state hospital.

After an extended but mostly fruitless direct and cross-examination of Sorrell, the judge excused the jury and interrogated Sorrell as to his condition and ability to remember relevant facts.[32] It was apparent by then that Sorrell was either mentally incapable of testifying as to the events to which he previously testified or was refusing to testify. Weiss, over appellant's timely objection, sought to introduce Sorrell's prior testimony at appellant's first trial, where Sorrell had testified extensively and was subject to cross-examination by Cartin. The judge permitted parts of the transcript of the first trial (including sections of both Sorrell's direct and cross-examination testimony) to be read to the jury. Appellant now argues that his right of confrontation under the sixth amendment has been violated.

### B. *Discussion*

This case is substantially similar to *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930,

---

R.T., Thomas case at 672. The relevance and materiality of this question is unclear. Alzua had testified that he had informed authorities as to appellant's alleged admission to him, but that *he had not served as a prosecution witness for the last ten years.* Moreover, he admitted that he had been convicted of prior felonies and was currently facing two charges in state and federal courts. Alzua's supposed status as an informer is a neutral fact and would not have adversely affected his credibility especially given his other admissions.

**27.** R.T., Thomas case at 660.

**28.** R.T., Thomas case at 732.

**29.** Alzua initially responded that he had been released on bond but later said that he might have been released on his own recognizance. R.T., Thomas case at 662. He subsequently stated that his attorney had posted the bond. *Id.* at 667.

**30.** R.T., Thomas case at 732–33.

**31.** R.T., Thomas case at 363–66 and 390 *et seq.*

**32.** The exchange is reported in *Thomas, supra,* 110 Ariz. 120, 515 P.2d at 869–70.

26 L.Ed.2d 489 (1970). In *Green,* a prosecution witness, Porter, had testified at a preliminary hearing as to the details of defendant's sale of marijuana to him. At the defendant's trial, Porter was markedly evasive and uncooperative on the stand. He claimed an inability to remember the actual events of the marijuana sale. At various points during his direct examination, the prosecution, frustrated in its attempts to adduce live testimony, read into the record excerpts from Porter's preliminary hearing testimony. The Supreme Court held that the admission of Porter's prior testimony did not violate the Confrontation Clause for two separate reasons. First, the Court found that the defendant had an effective opportunity for confronting the witness at the subsequent trial. As stated in *Green*:

. . . the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories.

*Id.* 399 U.S. at 164, 90 S.Ct. at 1938. The second reason given by the Court was that Porter's prior testimony was given under circumstances which provided substantial compliance with the purposes behind the confrontation requirement, and the witness's inability to testify at the subsequent criminal trial was in no way the fault of the State. *Id.* at 166, 90 S.Ct. at 1939; *see also Ohio v. Roberts,* —— U.S. ——, ——, 100 S.Ct. 2531, 2537–39, 65 L.Ed.2d 597 (1980). The Court in *Green* stated:

We also think that Porter's preliminary hearing testimony was admissible as far as the Constitution is concerned wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial. For Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. Under these circumstances, Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable, despite good-faith efforts of the State to produce him. That being the case, we do not think a different result should follow where the witness is actually produced.

*Id.* 399 U.S. at 165, 90 S.Ct. at 1938–1939.

 The present case falls clearly within the ambit of the second *Green* rationale.[33] Sorrell's prior testimony which was utilized here was given at appellant's first trial under oath in front of a judge and accurately recorded by a court reporter. Appellant's attorney was present at the first trial and cross-examined Sorrell. Cartin also represented appellant at the second trial. Thus, there was substantial compliance with the confrontation requirement and sufficient "indicia of reliability" so that the jury in appellant's second trial was af-

---

**33.** We need not, and do not, decide the issue under the first *Green* rationale of whether an effective opportunity for confrontation at a subsequent trial occurs when the witness is present, is sworn in, but fails to concede having made the prior statements and either refuses to answer questions regarding the statements or claims a complete failure to remember them or the events which they concern. Justice Harlan in his concurrence in *Green* stated that the Confrontation Clause requires no more than that the prosecution produce the available witness whose declarations it seeks to use in a

criminal trial. 399 U.S. at 174, 90 S.Ct. at 1943. That approach has been adopted by some of the circuits which have considered the issue. *See e. g., United States ex rel. Thomas v. Cuyler,* 548 F.2d 460, 463 (3rd Cir. 1977), and cases cited therein. *Contra, Mayes v. Sowders,* 621 F.2d 850, 854 (6th Cir. 1980); *see also Douglas v. Alabama,* 380 U.S. 415 at 420, 85 S.Ct. 1074 at 1077, 13 L.Ed.2d 934. The Supreme Court has recently recognized this problem but has not yet resolved it. *Roberts, supra,* —— U.S. at ——, 100 S.Ct. at 2541.

forded a satisfactory basis for evaluating the truthfulness of Sorrell's prior testimony.[34] *Roberts, supra,* —— U.S. at ——, 100 S.Ct. at 2537; *Mancusi v. Stubbs,* 408 U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972).

■■■■ In addition, appellant challenges the trial judge's ruling that Sorrell was a hostile witness, which thereby permitted the prosecution to use cross-examination type questions on its own witness. Initially, we note that the state trial judge's classification of Sorrell as a hostile witness and his ruling permitting the prosecution to utilize leading questions is a matter of state evidentiary law which is committed to the trial court's discretion. *State of Arizona v.*

*Rice,* 116 Ariz. 182, 568 P.2d 1080, 1085 (Ariz.1977). Such a controversy ordinarily does not give rise to the federal constitutional question necessary for habeas corpus relief. *Cf. Cronnon v. State of Alabama,* 587 F.2d 246, 250 (5th Cir. 1978), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979). Moreover, in this case, it is evident from the record that Sorrell's responses to the prosecution's questions were evasive, ambiguous and definitely in conflict with his prior statements in two previous court proceedings. The trial judge did not err in ruling that Sorrell was a hostile witness for purposes of the prosecution's examination of him. *See generally Rice, supra,* 568 P.2d at 1085; *United States v.*

---

**34.** Appellant attempts to distinguish the Court's holding in *Green* from the present case. He first contends that he did not have an opportunity to fully and effectively cross-examine Sorrell at the first trial because important psychiatric evidence (that Sorrell was supposedly a *schizophrenic*) was unknown to appellant's attorney at that time. However, appellant has failed to cite to this court any reference in the record which demonstrates that Sorrell was in fact diagnosed a schizophrenic. Nor is there any evidence in the record to indicate that it was the State's fault that appellant's attorney was unaware of Sorrell's purported condition. Even assuming that Sorrell was schizophrenic, often information will surface after a trial which, if known to a defense attorney, would have made the cross-examination of a witness more thorough or even more advantageous to the defendant. Nevertheless, that lack of information does not make the opportunity for *cross-examination ineffective* even though the cross-examination itself is less than optimal for the defendant. In such a situation, the defendant should move for a new trial under the theory of newly discovered evidence or, if the *Government has hid the information from the* defendant, under a *Brady* challenge.

This court has stated that the test for whether cross-examination about a topic was effective is whether the jury is otherwise in possession of sufficient information with which to make a discriminating appraisal of the subject matter at issue. *Skinner, supra,* 564 F.2d at 1389. When the matter relates to impeachment evidence, we look to see whether the jury had sufficient information to appraise the bias, motives and credibility of the witness. *Id.,* and cases cited therein. The record here does indicate that in Cartin's cross-examination of Sorrell at the second trial, Sorrell stated that he was residing at the State hospital for the past three weeks and that he was a user of hard drugs including heroin and LSD. Once admit-

ted, the jury was made aware of this impeachment of Sorrell's credibility. Moreover, any additional evidence or cross-examination on Sorrell's alleged mental illness could have been introduced in the second trial at this point. Appellant's attorney failed to do so.

Further, the Supreme Court has recently stated that, except in "unusual circumstances" (such as those exhibited in *Mancusi, supra,* 408 U.S. at 214–15, 92 S.Ct. at 2313–2314), "no inquiry into 'effectiveness' [of the cross-examination] is required." *Roberts, supra,* —— U.S. at —— n. 12, 100 S.Ct. at 2543 n. 12. The present circumstances are not so extraordinary as to mandate any additional investigation of the effectiveness of appellant's cross-examination of Sorrell at the first trial. Under these circumstances, we do not find appellant's arguments persuasive.

Finally, appellant also claims error because the jury at the second trial was foreclosed from independently assessing Sorrell's demeanor at the first trial where his prior testimony was given. The Court in *Green* specifically dismissed this argument stating:

> Similar reasons lead us to discount as a constitutional matter the fact that the jury at trial is foreclosed from viewing the declarant's demeanor when he first made his out-of-court statement. The witness who now relates a different story about the events in question must necessarily assume a position as to the truth value of his prior statement, thus giving the jury a chance to observe and evaluate his demeanor as he either disavows or qualifies his earlier statement. . . .
> The defendant's confrontation rights are not violated, even though some demeanor evidence that would have been relevant in resolving this credibility issue is forever lost.
> *Green, supra,* 399 U.S. at 160, 90 S.Ct. at 1936.

*Karnes*, 531 F.2d 214, 216–217 (4th Cir. 1976).

Likewise, appellant's objections based on the Supreme Court's decision in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), are also unfounded. In *Douglas*, under the guise of cross-examining an accomplice as a hostile witness, the prosecutor, over the defendant's objections and despite the accomplice's continuing refusal to answer, read in the presence of the jury the accomplice's purported confession which implicated the defendant. Conversely, in this case, after the trial judge found Sorrell to be a hostile witness, the prosecutor did ask a lengthy series of questions which were leading in nature but otherwise not objectionable. Those questions did incorporate much of Sorrell's testimony at appellant's first trial. Sorrell's answers at the second trial varied between non-responsive replies and claims of lack of memory with occasional lucid admissions. After appellant's attorney cross-examined Sorrell, the prosecution proffered Sorrell's prior testimony at the first trial into evidence, said testimony being largely duplicative of the material covered by the prosecution's leading questions at the second trial. We have previously found that prior testimony to have been properly admitted. Thus, the present case is distinguishable from *Douglas*. In *Douglas* the focus was on the total lack of cross-examination or other effective confrontation of the accomplice as to his alleged confession, *id*. 380 U.S. at 419–20, 85 S.Ct. at 1077; whereas in this case Sorrell was extensively cross-examined by appellant's attorney at the first trial from which Sorrell's prior testimony was taken. Further, any error in the manner of the prosecution's questioning of Sorrell at the second trial was harmless given the fact that the same evidence was incorporated into Sorrell's testimony at the first trial, and the latter was properly presented to the jury at the second trial.

III. *Objections to the Prosecution's Trial Tactics*

Appellant challenges the manner in which the prosecution conducted itself during the trial. Specifically, he charges the prosecution with: 1) making improper offers of evidence knowing the evidence to be inadmissible, and 2) continually objecting during the appellant's examination of the witnesses such that the appellant was prevented from developing any continuity on direct examinations and denied his right of confrontation on cross-examinations. As to the first challenged practice, we have reviewed the portions of the record cited to us by the appellant. The trial judge in those instances properly admitted some of the proffered evidence, sustained appellant's objections as to others, and the prosecution withdrew its offers as to the remaining material. Appellant does not contend that the judge committed any error in his evidentiary rulings and we find none. Therefore, we find the prosecution's strategy, if indeed there was one employed by Weiss, to be non-prejudicial and insufficient to give rise to habeas relief.

Insofar as the prosecution's frequent objections during appellant's questioning of witnesses, we do find Weiss's tactics to be overzealous and somewhat obnoxious in this regard. But obnoxious conduct on the part of a prosecutor does not by itself warrant habeas corpus relief. After reading the relevant portions of the record, we agree with the Arizona Supreme Court that there was no violation of appellant's right of confrontation and that the defense was not effectively prevented from presenting its case. *Thomas, supra*, 110 Ariz. 120, 515 P.2d at 877–79.

IV. *Conclusion*

We do not find a violation of appellant's constitutional rights in the record of the state trial below. Thus, the judgment of the district court denying the petition for a writ of habeas corpus is AFFIRMED.