**Titus Lee BROWN, Jr., Petitioner–Appellant.**

v.

**Robert BORG, et al., Respondents–Appellees.**

No. 91–55148.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1991.

Decided Dec. 6, 1991.

Michael M. Crain, Klein & Crain, Los Angeles, Cal., for petitioner-appellant.

Donald F. Roeschke, Deputy Atty. Gen., Los Angeles, Cal., for respondents-appellees.

Before FLETCHER, D.W. NELSON and BRUNETTI, Circuit Judges.

FLETCHER, Circuit Judge:

Titus Lee Brown was convicted of first-degree murder in a trial in which the prosecutor knowingly introduced false evidence and then relied on that evidence in pressing for conviction in her final argument to the jury. (The false evidence suggested that the decedent had been murdered during the course of a robbery, when in fact the items allegedly stolen had been returned to the decedent's family by hospital staff who presumably found them on the decedent's body.) Upon learning of the prosecutor's misconduct, the trial judge declined to order a new trial, but reduced Brown's conviction from first to second-degree murder on the theory that the false evidence related only to the degree of the offense—i.e. whether Brown had committed felony murder—and not to Brown's guilt or innocence. The district court dismissed Brown's petition for a writ of habeas corpus. We reverse.

## FACTS

Israel Guzman Rangel ("Guzman") was stabbed to death in a parking lot in South Central Los Angeles shortly after midnight on August 17, 1984; the petitioner, Titus Lee Brown, was indicted for the murder. At the ensuing jury trial, the prosecution argued the theory that Guzman had been killed when Brown and an unnamed accomplice robbed him of his wallet and jewelry. The chief witness for the prosecution was Ricardo Pimental Baldavinos ("Pimental"). Pimental testified that he saw Guzman being attacked by two men. Pimental drew his unloaded gun and approached the assailants in an attempt to scare them away. Presented with a series of photo lineups a few days later, he identified Brown as the killer. Pimental's identification testimony had numerous weaknesses, as brought out in a lengthy cross-examination by Brown's counsel.

Among these weaknesses were the fact that the incident occurred at night; Pimental had never seen the assailant before; he only saw the assailant briefly, though his estimates of time varied from "a couple of seconds" to "five minutes"; he had been drinking earlier in the evening; he could not recall whether the assailant had facial hair; when first contacted by the police, Pimental denied any knowledge of the incident; and Pimental failed to identify Brown's photo when presented in a photo lineup at trial.

Neither Pimental nor any other prosecution witness offered eyewitness testimony of the alleged robbery. As proof of the robbery, the prosecution first presented a ring that had been found on the street at the scene of the crime. Guzman's uncle, a Mr. Rodriguez, testified that the ring had belonged to Guzman, who wore it on his middle finger because it was too large to fit properly on his ring finger. In response to a question about what jewelry Guzman customarily wore on his hands, Rodriguez volunteered that Guzman also customarily wore a neck chain. Following defense counsel's objection, the jury was instructed to disregard the testimony about the chain.

The prosecution further offered the testimony of Detective J.D. Furr, a police officer who investigated the crime. Furr offered his expert opinion that Guzman had

been killed during a robbery. Furr testified that his opinion was based on an examination of the scene of the crime, the ring found on the ground, interviews with the victim's family, and the fact that the victim's wallet and gold chains, which Furr believed the victim had been wearing on the night he was killed, were not found.

Q: (Prosecutor): What other facts, other than your interview with the brother, did you base your opinion on?

A: (Furr): He was also allegedly wearing some gold jewelry, chains at the time he was last seen *which were not present.* He was parked in close proximity to a bar frequented by Hispanics, allegedly going to that bar and *he had no money* at the hospital.

⋅ ⋅ ⋅ ⋅ ⋅

Q: Based on all of those factors, you felt that a robbery, there had been a robbery that had been occurring at the time of the murder; is that correct?

A: That's correct.

Reporter's Transcript at 601–02 (emphasis added).

In her closing argument, the prosecutor repeatedly referred to the alleged robbery and to Guzman's allegedly missing property and urged the jury to return a verdict of first-degree felony murder. The prosecutor's closing argument contained the following remarks:

"There was no testimony presented whatsoever that there was any property of any value found on the person of the victim. No wallet, no gold chains, which the uncle indicated that he had seen on his nephew earlier that evening.... Or any property. The only property that was found at the scene was this ring."

"[A]ccording to the blood trail, according to the detective, that man was ambushed, set upon by those two men at his car."

"That man was set upon, he was jumped for his money and his property."

"It is not an unreasonable inference, ladies and gentlemen, to assume that that missing jewelry was stripped from that man as he was dragged out into the street here and that's how that ring came

off that man's fingers. Not that it dropped."

Defense counsel attempted to counter the robbery theory during his closing argument.

"The prosecutor would have you believe that a robbery took place and that the murder arose out of a robbery and that Titus Brown is the killer. The problem with this is that it does not fit the evidence. The evidence does not support a finding of a robbery. For the robbery itself first must be proved beyond a reasonable doubt and to a moral certainty."

"Next officers seem to think that the motive here may have been robbery. They just toss that out. No one looks for any chains. No one looks for any money. It just seems to be thrown out to you as a possible motive. Plus we have no testimony that the victim was wearing any chains that night or he had any money."

"So what really do we have here? We've got no evidence of a robbery. Either from direct evidence or recovered hard evidence. Just the police officer saying well, I think maybe a robbery took place. There is no loot. No evidence of any money or chains on [Guzman] that night. Just the big ring that was found there that the officer even admitted or he originally thought it fell off the guy's finger."

In rebuttal, the prosecution once again alluded to the false evidence.

"Interestingly enough, of course, [defense counsel] had previously argued that there was no evidence of any item of value around the body to have ever been removed, which, of course, is contradicted by Mr. Rodriguez' testimony."

In fact, Mr. Rodriguez testified only that his nephew customarily wore the ring that was found on the scene; a response that he typically wore a gold necklace was stricken.

The trial court instructed the jury on the elements of second-degree murder, wilful and deliberate first-degree murder, and

first-degree felony murder.[1]  It also gave the following instruction on motive:

> Motive is not an element of the crime charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish guilt.  Absence of motive may tend to establish innocence.  You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled.

CALJIC 2.51.  On these instructions, the jury convicted Brown of first-degree murder.

Some days after the jury returned its verdict, the prosecutor revealed to the trial court that an investigator from the district attorney's office had informed her that the allegedly missing wallet and gold chains had been given to Guzman's next of kin by hospital personnel, who presumably had discovered them on Guzman's person.  The prosecutor had known this fact before trial, but did not inform defense counsel.  Nor did she inform Detective Furr, whose expert opinion rested in part on the absence of those items.  The trial court found that the prosecutor's actions—failing to notify defense counsel of material exculpatory evidence and arguing false evidence to the jury—constituted prosecutorial misconduct.  The trial court, however, denied defense counsel's motion for a new trial and instead reduced the conviction from first to second-degree murder.  Even though the court felt sure that the jury had convicted based on the felony murder theory, it reasoned that there was sufficient evidence on the record to convict Brown of second-degree murder.

Defense counsel renewed the motion for a new trial at sentencing, but it was again denied.  The California Court of Appeal affirmed the second-degree murder conviction.  *People v. Brown*, 207 Cal.App.3d 741, 255 Cal.Rptr. 67 (1989).  The California Supreme Court denied review, and or-dered the Court of Appeal decision de-published.  *Id.* 255 Cal.Rptr. at 67 n.*.

His state remedies exhausted, Brown petitioned for a writ of habeas corpus in the federal district court, arguing that the false evidence proffered against him related to his very guilt or innocence, thus rendering his trial fundamentally unfair in violation of his right to due process of law.  A magistrate, reviewing the record, concluded that the false evidence submitted and argued to the jury affected only the degree of the crime, and recommended that the writ be denied with prejudice with regard to his current claim, but without prejudice with regard to a possible future petition to reduce the conviction to manslaughter.  In a one-page order, the district court adopted the findings, conclusions and recommendations of the magistrate.  Petitioner now appeals.

## STANDARD OF REVIEW

■  A district court's denial of a petition for writ of habeas corpus is reviewed *de novo*.  *Norris v. Risley*, 878 F.2d 1178, 1180 (9th Cir.1989).

■  Prosecutorial misconduct in a state criminal proceeding will be grounds for a writ of habeas corpus unless the prosecution can show that the error was harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).  The question of whether respondents have proved harmlessness beyond a reasonable doubt is a mixed question of law and fact which should be reviewed *de novo* since it does not call for a predominantly factual inquiry.  *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir.), *cert. denied* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## DISCUSSION

The state does not challenge the trial court's ruling that the prosecutor acted improperly.  By failing to inform the de-

---

**1.** No evidence of premeditation was offered at trial, and the prosecutor did not stress that theory.  The parties and the trial judge agree that the jury's verdict of first-degree murder must have been premised on felony murder.

fense that Guzman's wallet and jewelry had not been stolen, the prosecutor violated the duty to inform the defense of material exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). By allowing Detective Furr to testify to an opinion based in part on the allegedly stolen items, she violated the duty to correct false evidence when it is offered. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Finally, by arguing to the jury that the items were missing, she violated the duty not to argue false or inadmissible evidence to the jury. *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *United States v. Brown,* 880 F.2d 1012 (9th Cir.1989).

■ The proper role of the criminal prosecutor is not simply to obtain a conviction, but to obtain a *fair* conviction. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196. It was to insure that defendants are not subjected to unfair trials that the limits on prosecutorial conduct evolved. Accordingly, when exculpatory evidence is withheld, attention focuses on its effect on the defendant's right to due process; the prosecutor's intentions are irrelevant. *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976); *Thomas v. Cardwell,* 626 F.2d 1375, 1382 n. 24 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). The prejudice to a defendant's right to a fair trial is even more palpable when the prosecutor has not only withheld exculpatory evidence, but has knowingly introduced and argued false evidence. This circuit has acknowledged that "a prosecutor's presentation of tainted evidence is viewed seriously and its effects are exceedingly carefully scrutinized." *United States v. Polizzi,* 801 F.2d 1543, 1550 (9th Cir.1986). A new trial is required "if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Id.*[2] The Supreme Court has stated:

> [I]t is established that a conviction obtained through use of false evidence,

known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, [is] implicit in any concept of ordered liberty....

*Napue v. Illinois,* 360 U.S. at 269, 79 S.Ct. at 1177 (citations omitted).

■ The prosecutor's actions in this case are intolerable. Possessed of knowledge that destroyed her theory of the case, the prosecutor had a duty not to mislead the jury. Instead, she kept the facts secret in the face of a long-standing rule of constitutional stature requiring disclosure, and then presented testimony in such a way as to suggest the opposite of what she alone knew to be true: that the wallet and chains had not been stolen in a robbery. Such conduct perverts the adversarial system and endangers its ability to produce just results. In response to the threat such misconduct poses to the rule of law, the Constitution requires convictions like Brown's to be overturned unless the misconduct can be proven to be harmless beyond a reasonable doubt.

The state argues that it has met this rigorous test to sustain the conviction of second-degree murder. The jury originally convicted Brown on a theory of felony murder. There is no dispute that the falsified evidence went to the existence of the felony itself, and that if the jury had known the truth, they might have decided that no robbery or attempted robbery had taken place. The district court held, and respondents argue on appeal, that the jury's response to this would have been to reduce the degree of the offense, not acquit. Brown contends, however, that the robbery did more than establish a felony as a predicate for felony murder: it supplied motive for the crime. Therefore, the result of an untainted trial might have been an acquit-

---

**2.** This test is equivalent to the *Chapman* harmless error test. *United States v. Bagley,* 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 3382 n. 9, 87 L.Ed.2d 481 (1985).

tal. This argument is particularly persuasive since the prosecutor repeatedly urged robbery as the motive for the killing.

■ Although motive is not a necessary element of murder, Cal. Penal Code §§ 187, 189, *United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir.1989), it is material evidence that a jury may properly consider in deciding whether the defendant was the perpetrator of the crime. "Evidence of motive may be offered to prove that the act was committed, or to prove the identity of the actor, or to prove the requisite mental state." 22 C. Wright & K. Graham, *Federal Practice and Procedure: Federal Rules of Evidence* § 5240 at 480 (1978). California courts have repeatedly recognized this proposition:

> Instructions generally pointing out the relationship of motive and lack of motive to guilt and innocence have long been approved in this state. Lack of motive is not only relevant on the issue of identification, but also to the issue of premeditation and deliberation.

*People v. Sears*, 2 Cal.3d 180, 190, 465 P.2d 847, 853, 84 Cal.Rptr. 711, 717 (1970) (citations omitted). *Accord, People v. Beyea*, 38 Cal.App.3d 176, 194–95, 113 Cal.Rptr. 254, 265 (1974) ("Proof of the presence of motive is material as evidence tending to refute or support the presumption of innocence"); *People v. Whittaker*, 41 Cal. App.3d 303, 115 Cal.Rptr. 845, 847 (1974). The trial court's instruction on motive—that proof of motive could be evidence of guilt while lack of motive could be evidence of innocence—correctly stated California law.

Given this instruction, the jury could have considered the false evidence probative of Brown's guilt. Without the tainted evidence, the jury could have considered the lack of motive as probative of his innocence. Without proof of a motive, the jury would be entitled to view the prosecutor's case as incomplete or weak, or in other words, not proven beyond a reasonable doubt. The prosecutor was simply wrong in arguing on the motion for new trial, that "this kind of evidence does not go to the theory that was proposed by the defense,

namely that Mr. Brown was not ever present and not involved at all." On the contrary, it appears, as the trial judge remarked, that "the missing items were extremely strong evidence in proving to the jury that the motivation of the defendant, the specific intent was to commit a robbery."

The state argues that even without the false evidence, Pimental's eyewitness identification was sufficient proof in and of itself to convict Brown of second-degree murder beyond a reasonable doubt. In the words of the magistrate, later adopted by the district court, "there is no rational basis for believing that the jury's evaluation of the credibility of the eyewitness would have at all been influenced by whether or not a robbery had taken place."

Pimental's credibility was the main issue at trial, the subject of a lengthy cross-examination and the greater portion of defense counsel's closing argument. While it is, of course, the jury's prerogative to find Pimental's testimony credible, it is not as clear as the district court supposes that the jury's credibility determination was divorced completely from its evaluation of the robbery evidence. Pimental's credibility was examined in the context of an alleged robbery. Absent the prosecutor's misconduct, the jury could have concluded that there was no robbery, and thus no demonstrated motive for Brown to have killed Guzman. If this were the case, testimony identifying Brown as the murderer would at least be puzzling, and the jury might well have scrutinized such testimony more carefully. One way to test credibility is to see how the testimony fits with known facts. In view of this, a jury with unanswered questions regarding Brown's reason to be on the scene might have resolved the hotly contested issue of credibility differently.

■ Brown is not mounting a challenge to the sufficiency of the evidence. Rather, he urges that "there is [a] reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Polizzi*, 801 F.2d at 1550. The materiality of the false evidence must be judged in the con-

text of the entire record. As the Supreme Court said in *United States v. Agurs*, "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). Given the many weaknesses in Pimental's identification, the false evidence of robbery cannot be shown beyond a reasonable doubt not to have swayed the jury.

The Supreme Court has found due process violations in several cases where prosecutors knowingly have introduced and argued from false testimony. *See Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) (prosecution based on perjured testimony); *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (prosecutor proffered men's undershorts allegedly stained with murder victim's blood, when stains were actually paint); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (prosecution witness falsely testified that he had not received consideration for his testimony); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (same).

 We note again the prosecutor's repeated references in closing argument to the false evidence. Improprieties in closing arguments can, themselves, violate due process. *Chapman* itself was such a case. 386 U.S. at 18, 87 S.Ct. at 824 (prosecutor's urging improper inference of guilt from defendant's decision not to take the stand held not harmless error). The force of a prosecutor's argument can enhance immeasurably the impact of false or inadmissible evidence. *E.g., Miller v. Pate* 386 U.S. at 6, 87 S.Ct. at 787 (decrying prosecutor's "consistent and repeated misrepresentation" that paint stains were actually blood). Our court's description of the effect of the prosecutor's argument in *United States v. Brown* applies equally to this case:

> Despite the other evidence against [the defendant], the continued references to [the inadmissible evidence] at the Government's closing arguments make it impossible for us to say it is more likely than not that [it] did not affect the jury's verdict.

880 F.2d at 1016 (prior bad acts erroneously admitted as evidence of bad character).

## CONCLUSION

Because the prosecutor's misconduct was not harmless beyond a reasonable doubt, we reverse. We remand to the district court to grant the writ unless Brown is retried promptly.

REVERSED and REMANDED.