**UNITED STATES, Appellee,**

v.

**Oladipo SALIMONU, Defendant, Appellant.**

No. 97–1557.

United States Court of Appeals, First Circuit.

Heard March 2, 1999.

Decided July 7, 1999.

Kimberly Homan with whom Sheketoff & Homan and John L. Roberts, by appointment of the Court, were on brief for appellant.

Jennifer Zacks, Assistant United States Attorney, with whom Donald K. Stern,

United States Attorney, was on brief for appellee.

Before Stahl, Circuit Judge, Magill,* Senior Circuit Judge, and Lipez, Circuit Judge.

STAHL, Circuit Judge.

After a 14–day trial, a jury found defendant-appellant Oladipo Salimonu guilty on eight counts, including, *inter alia,* conspiracy to import heroin. He appeals the convictions on several grounds. After a careful review of the record and Salimonu's arguments, we affirm.

## I.

### Background

We sketch the facts in the light most favorable to the verdict. *See United States v. Cunan,* 152 F.3d 29, 32 (1st Cir. 1998). Salimonu was involved in a conspiracy with Christopher Perry, Ralph Petrosino, Kim McKinnon, and others to import heroin from Thailand. Salimonu and Perry had known each other since about 1988. Beginning in 1990, Perry and Salimonu had several conversations about smuggling drugs and recruiting couriers. Perry recruited Petrosino and McKinnon to act as drug couriers, and introduced Salimonu to them as "Laddie." In May 1992, Petrosino traveled to Bangkok, Thailand, where "Laddie" called him several times at his hotel. Petrosino was given a suitcase, which he brought to McKinnon in Jakarta, Indonesia. "Laddie" called McKinnon at her hotel every day she was in Jakarta. McKinnon subsequently traveled to Boston with the suitcase, where customs agents inspected it and found four kilograms of heroin. McKinnon immediately agreed to cooperate with the customs agents, and that night the agents recorded phone conversations between "Laddie" and McKinnon. The agents then accompanied McKinnon to O'Hare Airport in Chicago, where they arrested Perry, who also

agreed to cooperate. Agents arrested Petrosino a few days later, in Chicago. Thereafter, agents recorded a phone conversation between Petrosino and "Laddie."

On September 16, 1992, a grand jury returned an indictment against Salimonu for conspiracy to import heroin, in violation of 21 U.S.C. §§ 963, 952(a); importation of heroin, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2; conspiracy to possess with intent to distribute, and conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841, 846; possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and unlawful use of a communications facility (the telephone) to facilitate the drug offenses, in violation of 21 U.S.C. § 843(b).

Salimonu was arrested on July 27, 1993. After the arrest and while Salimonu was in custody, customs agents conducted a warrantless search of his apartment, relying upon the consent of a third party.

On December 15, 1995, more than two years after his first appearance in court, Salimonu moved for his indictment to be dismissed with prejudice, alleging violations of both the Speedy Trial Act ("STA") and his Sixth Amendment right to a speedy trial. The district court denied this motion, ruling that most of the time that had elapsed was excludable from STA calculations. Trial began on November 11, 1996.

At trial, Petrosino, McKinnon, and Perry, all of whom had entered plea agreements, identified Salimonu as "Laddie" and testified against him. Their testimony was corroborated by, *inter alia,* phone records discovered through a phone contract discovered during the search of Salimonu's apartment, and by recordings of the phone conversations between McKinnon and "Laddie" and between Petrosino and "Laddie." Salimonu moved to suppress the phone records and other documentary evidence seized in the search; the district court denied the motion. Salimonu also

* Of the Eighth Circuit, sitting by designation.

attempted to introduce expert testimony that the voice in the taped recordings was not his, but the district court excluded the testimony.

On December 6, 1996, a jury found Salimonu guilty on all counts. He was sentenced to 264 months' imprisonment followed by 60 months' supervised release.

On appeal, Salimonu challenges his conviction on five grounds: (1) he was denied his rights under the STA; (2) he was denied his Sixth Amendment right to a speedy trial; (3) evidence used to convict him was illegally obtained in a warrantless search of his apartment that violated the Fourth Amendment; (4) the district court improperly excluded expert testimony from evidence; and (5) the evidence was insufficient as a matter of law to establish his guilt beyond a reasonable doubt.

We discuss each issue in turn, setting forth additional relevant facts as necessary.

## II.

### Speedy Trial Act

■ Salimonu claims that the STA, 18 U.S.C. §§ 3161–3174, was violated by the delays in bringing his case to trial, and that the district court should therefore have dismissed his indictment. This court reviews an STA determination "for clear error as to factual findings and *de novo* as to legal rulings." *United States v. Santiago–Becerril,* 130 F.3d 11, 15 (1st Cir.1997) (citation omitted).

Section 3161(c)(1) of the STA dictates that a defendant be tried within seventy days of the indictment or the date of defendant's first appearance, whichever comes later. *See* 18 U.S.C. § 3161(c)(1). Section 3161(h), however, mandates the exclusion of certain periods of delay in calculating these seventy days, including some delays resulting from pretrial motions. *See* 18 U.S.C. § 3161(h).

Here, the relevant dates and proceedings are generally not in dispute. Sali-

monu made his initial appearance in the district court on September 3, 1993. Salimonu moved for a bill of particulars and for further discovery relating to cooperating witnesses on October 4, 1993. On November 11, 1993, without a hearing, the magistrate judge denied these motions. On December 9, 1993, Salimonu moved for reconsideration of the magistrate's November 11 orders in the district court, and requested a hearing on the motions. The district court took no actions on Salimonu's motions for reconsideration and did not schedule a hearing for either motion. Two years later, on December 15, 1995, Salimonu moved to dismiss the indictment against him with prejudice, asserting violations of the STA.

■ The parties are not in dispute that, as of December 8, 1993, fewer than 70 nonexcludable days had elapsed. Thus, the merits of Salimonu's STA motion turn on whether the time period beginning December 9, 1993, when Salimonu made two motions for reconsideration, is excludable for STA purposes. On June 29, 1996, more than six months after Salimonu had filed his motion to dismiss the indictment, the district court ruled that the time between the filing of Salimonu's motions for reconsideration on December 9, 1993 and the hearing on those motions, which it scheduled for August 2, 1996, was excludable under section 3161(h)(1)(F). That section excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). The court first determined that a hearing was required for Salimonu's motions to reconsider, and then concluded that the long delay in holding the hearing was therefore irrelevant. *See Henderson v. United States,* 476 U.S. 321, 329–30, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) ("[W]hen a pretrial motion requires a hearing . . . subsection (F) on its face excludes the entire period between the filing of the motion and the conclusion of the hearing . . . whether

or not a delay in holding that hearing is 'reasonably necessary.' "); *United States v. Staula,* 80 F.3d 596, 601 (1st Cir.1996) ("For motions that require a hearing, this subsection excludes the time between the filing of the motion and the hearing on that motion, even if the delay is overlong, inexplicable, or unreasonable.") (citations omitted). Salimonu first contends that the court erred in determining that a hearing was required for his motions for reconsideration. Such an error would be significant, because in contrast to the potentially unreasonable time that is excluded from STA calculations when a hearing is required, only 30 days may be excluded when a hearing is not required. *See Henderson,* 476 U.S. at 329, 106 S.Ct. 1871 (stating that when a hearing is not required, a motion must be given a "prompt disposition" within no more than the 30 days provided for matters held under advisement in section 3161(h)(1)(J)). While there is little authority on what constitutes a required hearing, this court has implied that a request for a hearing ends the inquiry: "[T]he appellant requested a hearing on his motions, thus acknowledging that one was appropriate. Consequently, we need not discuss the factors that determine whether a given motion 'requires' a hearing." *Staula,* 80 F.3d at 601 n. 2; *accord United States v. Tannehill,* 49 F.3d 1049, 1052 n. 4 (5th Cir.1995). Because Salimonu requested a hearing in this case, we properly can assume that such a hearing was required for section 3161(h)(1)(F) purposes. In any event, the district court in this case specifically found that this was the type of motion for which hearings are required: "[A] hearing on the motions filed on December 9, 1993 is required for their proper disposition. Both motions raise serious issues, particularly the motion for discovery from cooperating individuals. It is this court's regular practice to provide hearings on such motions and the court intends to do so here." This is a sufficient indication that a hearing was required: the district court is in a better position to determine the necessity of a hearing than we are, and although the delay was significant, we are loath to question the court's judgment in this area absent obvious subterfuge.[1]

Alternatively, Salimonu suggests that even if a hearing was required for his motions, the delay in his case was not "delay *resulting from* any pretrial motion," 18 U.S.C. § 3161(h)(1)(F) (emphasis added), but rather was caused by administrative oversight. Some circuits have held that when there is *no* causal link between the pretrial motion and the delay, the delay is not excludable, *see United States v. Gambino,* 59 F.3d 353, 359 (2d Cir.1995) (delay not excludable when hearing on motion was continued until after trial); *United States v. Clymer,* 25 F.3d 824, 830–31 (9th Cir.1994) (same), though not all the circuits have followed this approach, *see United States v. Riley,* 991 F.2d 120, 123 (4th Cir.1993) (holding that when a hearing on a pretrial motion is deferred until after trial, all of the time from the filing of the motion until its disposition is nonetheless excludable); *United States v. Wilson,* 835 F.2d 1440, 1443 (D.C.Cir.1987) (holding that "the exclusion of the time between the filing and disposition of pretrial motions under § 3161(h)(1)(F) is automatic and need not cause actual delay of the trial"). Even if we were to adopt the rule in *Gambino* and *Clymer,* however, the rule would not apply in this particular factual situation.

In both *Gambino* and *Clymer,* the district courts explicitly continued the mo-

---

1. In his main brief, Salimonu implies that the district court manufactured a hearing in order to evade the STA requirements. We have stated that "we will not permit either the district court or the prosecution to jerry-build a 'hearing' in order to thwart the concinnous operation of the Speedy Trial Act." *Staula,* 80 F.3d at 602 n. 3. We need not address this issue, however, because in his reply brief Salimonu abandons this argument. He states: "Appellant does not mean to impugn in any way the integrity of the district court in this case. The issue raised ... [is] not one which looks to the perceived sincerity of the district court's after-the-fact designation of a motion as one which 'requires' a hearing."

tions at issue until the end of the trials. In effect, these continuances amounted to denying the motions without prejudice to the filing of renewed submissions after trial. *See Gambino,* 59 F.3d at 359; *Clymer,* 25 F.3d at 830. The *Clymer* court stated that this was the exceptional situation in which "the pendency of the motion did not delay the start of the trial; rather the delay in the commencement of the trial caused the delay in hearing the motion." *Clymer,* 25 F.3d at 831. In contrast, "in the ordinary case all pretrial delay that coincides with the pendency of a motion will occur as a result of that motion (because the district court will ordinarily hold off the trial date until it decides the motion). . . ." *Id.* at 830. Moreover, the Supreme Court's determination in *Henderson* that even unreasonable delays are "automatically" excluded lends support to the idea that we should not examine whether the pending motion "caused" the delay in a narrow sense. *See Henderson,* 476 U.S. at 327, 106 S.Ct. 1871. Rather, as long as a hearing on the motion is to be conducted before trial, the delay until the hearing automatically should be considered delay "resulting from" a pretrial motion.

The delay in bringing Salimonu to trial was indeed overlong, and the district court should have acted with much more expedition. Nonetheless, because a hearing was required on his motions for reconsideration, the delay "resulting from" these motions was properly excluded from STA calculations. Thus, the district court did not err in denying Salimonu's motion to dismiss for violation of the STA.

### III.

### Sixth Amendment Claim

■■■■■ The fact that the STA was not violated does not automatically preclude us from finding a violation of Salimonu's Sixth Amendment right to a speedy trial, although it would be unusual to have a case where the STA is satisfied but the Sixth Amendment guarantee is violated. *See Santiago–Becerril,* 130 F.3d at 21. This circuit reviews a district court's ruling on a Sixth Amendment speedy trial claim for abuse of discretion. *See id.*[2]

■■■ The district court correctly analyzed Salimonu's Sixth Amendment claim in light of four factors: (1) length of delay; (2) reason for the delay; (3) defendant's assertion of his right; and (4) the prejudice to defendant. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The court determined that the reasons for the delay were, at least in part, attributable to Salimonu, and that Salimonu failed promptly to assert his right. The court therefore concluded that the length of the delay and the prejudice to Salimonu were outweighed by his own responsibility for the delay.

Salimonu has failed to meet his burden in showing that this determination was an abuse of discretion. While the two-year delay in proceeding with Salimonu's trial was inordinately lengthy, Salimonu never made an attempt promptly to assert his speedy trial right or to expedite his trial. *See Barker,* 407 U.S. at 532, 92 S.Ct. 2182 (finding that failure to assert his right "will make it difficult for a defendant to prove that he was denied a speedy trial"); *Santiago–Becerril,* 130 F.3d at 22 ("A defendant should give some indication, prior to his assertion of a speedy trial violation, that he wishes to proceed to trial.") (citations omitted). Salimonu never brought the pending motions to the court's attention

---

2. We note that most circuits review *de novo* the legal conclusion that a Sixth Amendment right to a speedy trial has not been violated. *See, e.g., United States v. Brown,* 169 F.3d 344, 348 (6th Cir.1999); *United States v. Manning,* 56 F.3d 1188, 1193 (9th Cir.1995); *United States v. Dirden,* 38 F.3d 1131, 1135 (10th Cir.1994). But as a newly-constituted panel, we are not at liberty to revisit the standard of review. *See, e.g., United States v. Sawyer,* 144 F.3d 191, 196 (1st Cir.1998) (stating that First Circuit panels are generally bound by prior panel decisions).

and waited two years before bringing his STA claim. Therefore, we cannot say that the district court abused its discretion in determining that Salimonu's own responsibility for the delay outweighed the prejudice to him.

## IV.

### Search

■ Salimonu claims that the warrantless search of his apartment violated the Fourth Amendment because Tonya Picou, a third party, did not have authority to consent to the search and because her consent was involuntary. We review the legal determination of whether a third party had authority to consent to a search *de novo*. Cf. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir.1996). Voluntariness of a consent to search is a question of fact, which we review for clear error. *See United States v. Kimball*, 741 F.2d 471, 473 (1st Cir.1984).

### A. Background

The evidence, as found by the district court, establishes the following. On September 3, 1993, while Salimonu was in custody, the management of Salimonu's apartment building informed customs agents that a woman had been granted access to Salimonu's apartment. The agents proceeded to the apartment, knocked on the door, and Picou answered. The agents testified that Picou agreed to a search of the apartment. She also told the agents that she had received a letter giving her authority to move Salimonu's property from the apartment, presenting to them the following handwritten note, signed by Salimonu, using one of his aliases:

To Whom It May Concern

c/o Columbus Plaza

This is to authorize the bearer of this letter, Ms. Tonya Picou to pick up all the contents of 233 E. Wacker, Apt. 3402 and to move them out and retain possession of the said contents as I am presently encountering some legal problems. So I Maxwell Ola–Cole (ssn 341–74–9863) hereby give Tonya Picou permission to remove all the furnishings and personal effects in their entirety.

/s/ Maxwell Ola–Cole

Apt. 3402

After first performing a security sweep and then reading the letter, the agents searched Salimonu's apartment. Picou was present during the entire search, which lasted about an hour.

During the search, the agents found and seized a number of documents from the kitchen counters and drawers. These included a cellular phone contract in the name of Angela Nash.

On August 22, 1996, Salimonu moved to suppress the evidence from the search, arguing both that Picou lacked authority to consent to the search and that her consent was not voluntary.[3] After holding an evidentiary hearing, the district court determined that the letter gave Picou actual authority to permit the agents to search Salimonu's apartment. The court also decided that Picou's consent was voluntary.

### B. Analysis

■ There is some question whether Salimonu's letter gave Picou authority to consent to the search. *See United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("common authority" over property such that parties may consent to a search rests on "*mutual use* of the property by persons generally having joint access or control for most purposes") (emphasis added). But we

---

**3.** Salimonu claims that the agents obtained Picou's consent in a coercive manner. According to Salimonu, the agents posed as movers, searched Picou's purse without permission, accused her of lying, and threatened to have the Illinois child protection agency take away her son. The district court explicitly rejected Salimonu's recitation of the facts, however, and stated that Picou's testimony about what happened was not credible.

need not reach that more difficult issue because any error that the district court may have committed is harmless; it is " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " [4] *United States v. Wihbey*, 75 F.3d 761, 769 (1st Cir.1996) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

As noted, the evidence that emerged as a result of the search included a cellular telephone contract in the name of Angela Nash.[5] This contract did lead to the discovery of telephone records which established that from December 31, 1991 through February 6, 1992—almost four months *before* the drug couriers left the country—Salimonu made 40 calls to Perry's house, 17 calls to Perry's beeper, and 14 calls to the hotels where Perry and McKinnon (who were romantically involved) were temporarily living. The content of these phone calls is unknown.

Of course, these phone records tended to reinforce a point already well-established by evidence obtained independently of the search: that Salimonu and Perry were in regular contact with one another.[6]

But the fact that Salimonu had an ongoing relationship with Perry was all but conceded at trial.[7] Moreover, the mere fact that Salimonu called Perry regularly did little to help prove the central point: that Salimonu was involved in an illicit conspiracy, as was charged.

In contrast, there was overwhelming evidence indicating that Salimonu was involved in the specific drug conspiracy in question. *See United States v. Innamorati*, 996 F.2d 456, 476 (1st Cir.1993) (stating that "wrongfully admitted evidence must be 'quantitatively assessed in the context of other evidence presented' ") (citations omitted). The three co-conspirators testified in detail as to Salimonu's leadership role in the conspiracy, avowing that Salimonu planned the drug trips, paid the co-conspirators' expenses, gave instructions as to where the couriers should stay and what they should do, and contacted the co-conspirators frequently. The fact that the three co-conspirators' testimony was detailed and basically consistent, despite the fact that all three were apprehended at different times and apparently had no opportunity to contact one another after their arrests, was substantial evidence of guilt.[8] *Compare Coppola v. Powell*, 878

4. Because any error would be harmless, we also need not examine the argument that Picou's consent was involuntary.

5. The government also introduced, as a result of the search, personal correspondence signed "Laddie" and an Illinois Bell calling card bearing the name "Foley Shomuga" (one of the alleged unindicted co-conspirators). Neither piece of evidence had any significance in the government's case. There was other evidence, including testimony by a travel agent who knew and identified Salimonu, that Salimonu went by the nickname "Laddie." Shomuga played a small part in the conspiracy, and the fact that there was a calling card in his name only indicated that Salimonu knew him. Moreover, Salimonu's acquaintance with Shomuga was independently corroborated by a letter, which the government's handwriting expert testified without contradiction was in Salimonu's handwriting, containing a reference to "Foley."

6. Documentary evidence presented at trial showed that, in 1990, Perry provided Salimo-

nu with his name, address, birth date, and social security number, and that Salimonu used this information to obtain a passport in the name "Christopher Perry." A postcard sent from Salimonu to Perry in 1991 included the statement "Don't forget we are going all the way." Perry's address books listed multiple phone numbers for "Laddie," and his 1991 appointment book had notations for "Laddie." Finally, an April 1992 phone bill from the hotel where McKinnon and Perry were staying indicated that either McKinnon or Perry called Salimonu from the hotel.

7. Indeed, Salimonu's counsel objected to the introduction of these records on the ground that they were irrelevant, stating: "I don't think anyone is going to argue [about whether] Mr. Perry had known Mr. Salimonu." Tr. 11/20/96 at 54–55.

8. In order to minimize the significance of the co-conspirators' consistent testimony and, perhaps, to suggest that McKinnon and/or Petrosino may have mistakenly identified Sal-

F.2d 1562, 1571 (1st Cir.1989) (no harmless error where untainted conflicting testimony of three jail inmates "raise[d] serious questions of credibility" and there were "gaps in the identification evidence") *with* *Clark v. Moran*, 942 F.2d 24, 32 (1st Cir. 1991) (distinguishing *Coppola*, because even though untainted inmate testimony "may have been inherently suspect because of the inmates' personal motives for testifying," there was "no conflicting testimony that needed to be reconciled" and there was other corroboration). This testimony was further supported by tapes of incriminating conversations between McKinnon and "Laddie" and between Petrosino and "Laddie." [9] The travel agent from whom Petrosino bought his plane ticket to Bangkok identified Salimonu as "Laddie," a regular customer at the travel agency, and testified that Petrosino told him that he was recommended by "Laddie." Finally, an invoice seized from Perry's possessions included handwritten notes of the names of hotels in Bangkok, along with a notation that stated: "Portable wait for call from Laddie Monday or Tuesday, 12 hours difference." Given all this evidence and given the insignificance of the phone records in the totality of the government's case, we are convinced that the records did not contribute to the jury's verdict.

In response to the government's suggestion that any error was harmless, Salimonu argues that the phone records were not only circumstantial evidence of the conspiracy, but were also essential corroboration of the co-conspirators' testimony. According to Salimonu, the records of the 14 calls to the hotels helped bolster McKinnon's credibility by corroborating her testimony that Salimonu called her. But the phone records only indicated that McKinnon was being truthful as to that one narrow and unimportant point in her testimony. Moreover, there was ample corroboration of McKinnon's central testimony as to Salimonu's involvement in the drug conspiracy. *See supra.*

We therefore find that any error in the admission of the evidence derived from the search was harmless beyond a reasonable doubt.

## V.

### Exclusion of Evidence

 Salimonu next claims that the district court erred in excluding expert testimony regarding the taped phone conversations. We review the district court's decision to exclude expert testimony for abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 138–39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The district court's decision to exclude evidence pursuant to Fed.R.Evid. 403 is also reviewed for abuse of discretion, with "great deference to the district court's judgment." *United States v. Currier*, 836 F.2d 11, 18 (1st Cir.1987).

imonu, the dissent contends that "McKinnon's and Petrosino's testimony was derived largely from what Perry told them," and that "McKinnon and Petrosino had limited personal contact with Salimonu." The dissent overstates the case. McKinnon, for instance, testified that on one of the occasions in which she met Salimonu in person, he gave her money and instructed her on how to obtain a passport. Furthermore, both McKinnon and Petrosino testified to speaking on the phone with Salimonu numerous times while abroad. Indeed, Petrosino testified that during two of these conversations, Salimonu discussed details related to the delivery of the suitcase in Jakarta.

9. Despite the dissent's statement that "The call between Petrosino and Salimonu was not inculpatory," the conversation did tend to show that Salimonu was involved in some kind of business with Petrosino and Perry. Petrosino beeped Salimonu, and Salimonu called him back, asking for "Ralph" and identifying himself as "Laddie." Petrosino told him that he was calling because he was "back a couple of days" and was "broke." Salimonu stated that he "didn't know" but would "call [him] right back." Then Salimonu asked, "Have you talked to Chris?" According to Petrosino, "Chris" referred to Christopher Perry.

## A. Background

Evidence presented against Salimonu included taped recordings of incriminating conversations between "Laddie" and McKinnon and between "Laddie" and Petrosino. Also presented to the jury, for purposes of comparison, was a voice exemplar that contained a recording of Salimonu's voice.

Salimonu sought to introduce the testimony of two expert witnesses to establish that the voice in the taped phone conversations and Salimonu's voice on the exemplar were different. The court permitted Robert Berkovitz, the developer of a spectogram computer program which plots the frequency and magnitude of speech signals, to testify that substantial differences between the spectograms of the two voices indicated that the tapes were of two different people. But the court would not allow Dr. Stephen Cushing, a linguist, to testify based on his listening to the tapes that the two voices were different.

The district court conducted a *voir dire*, during which Cushing stated that he had listened to the tapes several times and distinguished 14 differences between the two voices. Cushing admitted that he had no training or special certification in voice identification or comparison, and that he had only engaged in voice recognition procedures two or three times before. He had never before testified in court regarding voice identification. He conceded that a person may be able to disguise his voice, and stated that he did not know whether the voice in this exemplar was disguised. Cushing knew of no studies to determine the rate of error for this kind of identification. Finally, he stated that a lay person without linguistics training would be able to discern the same differences that he had by listening to the tapes.

Based on the *voir dire,* the district court excluded Cushing's testimony, relying upon several alternative theories. First, pointing to the lack of an error rate or other indicia of reliability, the court concluded that voice comparison was not sci-entific knowledge as defined in *Daubert v. Merrell Dow Pharms., Inc. See* 509 U.S. 579, 592–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (relevant factors include whether the technique has been tested, whether it is subject to peer review, whether there is a high "known or potential rate of error," and whether the technique enjoys general acceptance within the scientific community). Given that the jurors could listen to the tapes and discern differences in the voices themselves, the court also determined that this would not be an area in which expert testimony would be helpful to the jury. *See id.* at 591, 113 S.Ct. 2786 (asserting that expert testimony must assist the jury in resolving a relevant factual dispute); Fed.R.Evid. 702. Next, the court concluded that Cushing was not a qualified expert in the field even if this was a proper area for expert testimony, and his testimony should therefore be excluded under Rule 702. *See* Fed.R.Evid. 702 (stating that a witness "qualified as an expert by knowledge, skill, experience, training, or education" may give expert testimony). Finally, the court stated that even if the testimony were admissible under Rule 702, it should be excluded under Rule 403, because the unfair prejudice of the testimony would substantially outweigh its probative value. *See* Fed. R.Evid. 403.

## B. Analysis

Salimonu contends that the court erred in subjecting voice comparison—which he argues is specialized knowledge, not scientific knowledge—to the *Daubert* analysis for determining whether expert testimony rests upon sound scientific methodology. According to Salimonu, the *Daubert* analysis only applies to testimony based upon scientific knowledge. A recent Supreme Court case contradicts this assertion and affirms that a district court has discretion to determine the reliability of *any* specialized knowledge asserted by an expert witness. *See Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119

S.Ct. 1167, 1171, 1176, 143 L.Ed.2d 238 (1999). It would seem, then, that the court's assessment that Cushing's analysis was not reliable, based upon the lack of an error rate, the testimony that a voice could be disguised, and the lack of other indicia of reliability, was soundly within the court's discretion. *See id.* 119 S.Ct. at 1179 (holding that the district court's decision that expert testimony failed to satisfy *Daubert*'s factors *"or any other* set of reasonable reliability criteria" was not abuse of discretion).

■ At any rate, Cushing admitted that a layperson could distinguish the differences that he found by listening carefully to the two tapes. Thus, it was within the court's discretion to determine that Cushing's testimony would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Salimonu argues that the testimony would assist the jury, because the jury could not, without expert assistance, understand the reasons for the differences in the tapes or determine whether the differences indicated that the two speakers were different. *Cf. United States v. Shay*, 57 F.3d 126, 132 (1st Cir.1995) (questioning " '[w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved' ") (citations omitted). We are unconvinced. Cushing stated that an ordinary lay person without training in linguistics would be able to discern that the two voices were different without knowing why. It was not important, however, that the jurors be able to identify exactly which vowel sounds or intonations were different in the two tapes: their job was simply to determine whether the two voices were different. By Cushing's own admission, the jurors were perfectly well-equipped to do that. The court did not,

therefore, abuse its discretion in excluding Cushing's testimony.

## VI.

### Sufficiency of the Evidence

■ Finally, Salimonu contends that the government did not establish that he was guilty of all elements of the crimes beyond a reasonable doubt. We review the guilty verdict to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted).

■ Salimonu argues that there was insufficient evidence to support his convictions for conspiracy and for aiding and abetting on Counts 1, 2, 3, and 4, because there was no evidence that the co-conspirators had the requisite knowledge that they were agreeing to import a controlled substance. This argument is patently incorrect. Perry testified that he had many conversations with Salimonu about smuggling drugs. This in itself is sufficient evidence that Perry had the requisite knowledge. The testimony of McKinnon and Petrosino about the large sums of money they were to receive in exchange for transporting a suitcase into the country would enable a reasonable jury to infer that they knew they were importing a controlled substance into the country. Finally, the court instructed the jury that it could find Salimonu guilty of importing heroin even if McKinnon did not know she was bringing a controlled substance into the country "if the defendant willfully caused her to bring a controlled substance into the country." There was sufficient evidence for the jury to reach this conclusion.[10]

---

**10.** Salimonu alternatively states, without argument or citation to case law, that "the indictment required specific proof of knowl-

edge that heroin was to be imported." By failing to develop this argument, Salimonu has waived it. *See, e.g., United States v. Bon-*

Finally, Salimonu also argues that the voice identification testimony by McKinnon was insufficient to support a conviction on the counts involving use of a telephone. Between McKinnon's testimony and the tapes of the conversations provided, there was plenty of evidence to support the jury's verdict in this regard.

## VII.

### Conclusion

For the foregoing reasons, we affirm Salimonu's convictions in all respects.

*Affirmed.*

*Dissent follows.*

LIPEZ, Circuit Judge, dissenting.

The majority concludes that "any error the district court may have committed [in admitting evidence from the search] is harmless" because it is "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." I respectfully disagree with that conclusion. I must therefore analyze the legality of the search and the issue of harmless error.

### The Search

I do not question the district court's factual findings, e.g., I accept that Picou voluntarily consented to the search. I do, however, disagree with the district court's legal determination that Picou had actual legal authority or, in the alternative, that she had apparent authority to consent to the search of Salimonu's apartment.[11]

It is basic that "any intrusion upon a constitutionally-protected privacy interest without a proper warrant is per se unreasonable under the Fourth Amendment subject only to a few specifically estab-

lished exceptions." *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir.1992) (internal quotation marks omitted). Consent is one such exception to the warrant requirement. *Id.; see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In order for the consent to a warrantless search to be valid, however, the consent must come either from the defendant or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The Court explained in *Matlock* that common authority requires

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at n. 7. It is *common* authority which gives the consenting party the ability to allow the government to conduct a search "even when the defendant specifically objects to it." *Donlin*, 982 F.2d at 33. This common authority requirement reflects an important principle: the consenting party does not waive the defendant's Fourth Amendment rights. Instead, the consenting party voluntarily consents to waive his or her own privacy interest in the property to be searched, thereby validating the government's otherwise-proscribed warrantless search. "The burden of establishing that common authority rests upon [the government]." *Illinois v. Rodriguez*, 497

*giorno*, 106 F.3d 1027, 1034 (1st Cir.1997) ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation.") (citations omitted).

11. It is unclear from the transcript whether the district court adopted the apparent au-

thority doctrine as an alternative holding or merely acknowledged apparent authority as an alternative theory offered by the government. In any event, assuming the district court adopted the apparent authority doctrine as an alternative rationale, review of this legal determination is de novo.

U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

The district court erred in concluding that Picou had the requisite authority to consent to the search of Salimonu's apartment. At the suppression hearing, it was established that Picou did not live there; none of her possessions was in the apartment; indeed, she had never been in the apartment before the day it was searched. Far from having "joint access or control for most purposes," Picou's authority was highly circumscribed, as was evident from the letter and the circumstances surrounding her presence (e.g., that she needed the building management to provide her with a key). She had permission to enter the apartment solely for the purpose of facilitating the move of Salimonu's possessions into storage. Access to the apartment for that limited purpose cannot be reconciled with the joint access or control for most purposes which is required for valid consent. *See United States v. Hyson*, 721 F.2d 856, 859 (1st Cir.1983) (citing *Matlock*, 415 U.S. at 171, 94 S.Ct. 988).[12]

The district court did not distinguish between joint access or control over (and thus authority to consent to a search of) the *apartment* and joint access or control over the *possessions* inside the apartment when it emphasized in its decision Picou's authority to "take and retain possession of the property in the defendant's apartment." *See United States v. Warner*, 843 F.2d 401, 403 (9th Cir.1988) (permission for landlord to enter apartment for particular purpose did not give landlord authority to consent to search of apartment); *see also United States v. Fultz*, 146 F.3d 1102 (9th Cir.1998) (distinguishing joint access to a garage from joint access and control over the personal property in the garage). Whether the situation would be materially different if the government had attempted to secure consent to search possessions that had already been removed from the apartment is a question we do not have to address. The fact is that the government decided to execute a warrantless search of Salimonu's apartment and must justify *this* search.[13] Lacking joint access or control over the apartment for most purposes, Picou lacked authority to consent to its search.

The government's alternative apparent authority theory for justifying the search also misses the mark. Even if Picou lacked actual authority to consent to the search of Salimonu's apartment, the government argues, the search was valid because Picou had apparent authority to consent. Relying on *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the government contends that the Fourth Amendment is not violated by a consensual warrantless search if the police mistakenly, but reasonably, believed that the consenting party had actual legal authority to consent to the search. *See id.* at 188–89, 110 S.Ct. 2793. In *Rodriguez*, however, the police officers were literally tricked into reasonably believing that the consenting party had actual authority. *See id.* at 179, 110 S.Ct. 2793. The police in *Rodriguez* responded to a call and were met by Fischer, who showed signs of a severe beating. She told the officers where they could locate her assailant and agreed to take them to the apartment and to unlock the door with her key so that the officers could arrest him. Fischer repeatedly referred to the apartment as "our" apartment, and told the officers that she had clothes and furniture there. *Id.* Some of these representations turned out to be

**12.** In announcing its decision, the district court also found that Salimonu would have potentially been subject to eviction within weeks of the search. Although the district court may only have been noting that fact, that finding is irrelevant to the legality of the search. It is undisputed that at the time of the search Salimonu was a lawful tenant of the apartment and retained a privacy interest therein.

**13.** It is unclear why the government did not seek a warrant to search Salimonu's apartment.

false, and the Supreme Court concluded that the lower court's "determination of no common authority over the apartment was obviously correct." *Id.* at 182, 110 S.Ct. 2793. Nonetheless, the Court held that "what is generally demanded of the many *factual* determinations that must regularly be made by [government] agents ... is not that they always be correct, but that they always be reasonable," *id.* at 185–86, 110 S.Ct. 2793 (italics added), and upheld the search because of Fischer's apparent authority to consent to the search.

In this case, there are no mistaken factual determinations by the officers and the apparent authority doctrine is thus inapplicable. *See United States v. Whitfield,* 939 F.2d 1071, 1074 (D.C.Cir.1991) (holding that *Rodriguez* "held only that the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact, as distinguished from a reasonable mistake of law" and concluding that *"Rodriguez* thus applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be."); *United States v. Welch,* 4 F.3d 761, 764 (9th Cir. 1993) ("[T]he doctrine is applicable only if the facts believed by the officers to be true would justify the search as a matter of law."). Neither the Supreme Court nor any court of appeals that has applied *Rodriguez's* apparent authority doctrine has extended it to validate a warrantless search by officers who have made a reasonable error of law. *See United States v. Salinas–Cano,* 959 F.2d 861, 866 (10th Cir. 1992) ("[The police officer's mistake] was a mistake of law rather then a mistake of fact, and *Rodriguez* therefore does not resolve the issue.") (internal citation omitted).

*Rodriguez* does not purport to alter the legal standard for determining authority to consent to a search. Instead, it instructs that courts are to apply the correct legal standard not only to the facts as they actually existed but to the facts as a reasonable police officer would have believed them to be. In this case, unlike in *Rodriguez,* there were no factual misunderstandings about Picou's relationship with the apartment, and therefore the apparent authority doctrine is inapplicable. The officers only knew that someone who had come to the building with a letter from Salimonu authorizing her access to the apartment had also been given a key to the apartment by the building manager. On the basis of this information alone, government agents went to the apartment and asked Picou to consent to the search. It is irrelevant whether they read the letter from Salimonu before or after securing Picou's consent[14] because, as discussed above, the letter as a matter of law would not "warrant a man of reasonable caution in the belief," *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793,[15] that Picou had "joint access or control [over the apartment] for most purposes," *Matlock,* 415 U.S. at 171, n. 7, 94 S.Ct. 988. Under such circumstances, the warrantless entry was unlawful. *See Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. 2793.

*Harmless Error Beyond a Reasonable Doubt*

Having determined that the warrantless search violated Salimonu's Fourth Amendment right against unreasonable searches, I must inquire whether the government can carry its burden "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict

---

**14.** The district court's factual finding on this point is ambiguous but it appears that the district court found that the government agents did not read the letter before securing Picou's consent to search the apartment.

**15.** "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged

against an objective standard: would the facts available to the officer at the moment ... "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises?" *Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government's theory at trial was that Salimonu organized and led a conspiracy involving Christopher Perry, Kim McKinnon, and Ralph Petrosino, among others. The case against Salimonu came from the testimony of Perry and McKinnon, who had been caught with evidence incriminating them in a drug importation scheme, and from Petrosino, who admitted his involvement in the conspiracy. Each of them had plea bargained in exchange for testimony implicating Salimonu. Other than the testimony of the three co-conspirators, the government's remaining evidence consisted largely of (1) tape-recorded telephone conversations between Salimonu and McKinnon and Salimonu and Petrosino; and (2) the evidence seized during the warrantless search of Salimonu's apartment.

The defense's theory was that Salimonu had been mis-identified—that Perry, McKinnon, and Petrosino had falsely implicated him to protect themselves. One of the government's lead agents testified that a woman who had been recruited to join but did not in fact participate in the conspiracy identified another man (also Nigerian) as "Laddie" and as the head of the conspiracy. There was evidence that for some time during the fourteen months between the end of the conspiracy and Salimonu's eventual arrest the government considered that man, Olayinka Apanpa, to be the "Laddie" they were looking for, and three searches (each of them pursuant to a search warrant) were executed on Apanpa's properties.

I now turn to a more detailed discussion of the government's evidence.

1. *The Consistency of the Co-conspirators' Testimony*

The majority notes the consistency of the testimony of the co-conspirators and states that "[t]he three co-conspirators testified in detail as to Salimonu's leadership role in the conspiracy, declaring that Salimonu planned the drug trips, paid the co-conspirators' expenses, [and] gave instructions as to where the couriers should stay and what they should do." In fact, however, McKinnon's and Petrosino's testimony was derived largely from what Perry told them. McKinnon and Petrosino had limited personal contact with Salimonu; their involvement in the conspiracy was for the most part at the direction of Perry as well as other, unindicted co-conspirators who did not testify. They were recruited by Perry and both had personal relationships with Perry which pre-dated and were independent of the alleged conspiracy. Perry's motivation to plea bargain and implicate Salimonu in exchange for leniency was abundantly clear, and his credibility was further undermined by his admission that he had been a drug dealer of marijuana and cocaine prior to this conspiracy.

Petrosino testified to meeting Salimonu on only two or three occasions in the basement of the house of Perry's mother where Perry had been cutting Salimonu's hair. Any conversation between Salimonu and himself was brief, consisting exclusively of salutations, and he never spoke to Salimonu in person about anything relating to the conspiracy. In fact, Petrosino testified that Perry began recruiting him for the conspiracy in April 1992, more than three months *after* the last time Petrosino ever saw Salimonu in person. Petrosino also testified that he was given money in furtherance of the conspiracy on two occasions by a man named Foley whom Perry had instructed him to meet. Perry also told Petrosino how to get his pre-arranged plane ticket and how to acquire a passport, and it was Perry who provided Petrosino with money for his passport application. Indeed, on cross examination by the defense, Petrosino testified that on three separate occasions he expressed a desire to abandon the conspiracy but that Perry coerced him into continuing participation through threats and intimidation.

Although McKinnon likewise had relatively little face-to-face interaction with

Salimonu, testifying that during the course of the alleged conspiracy she met him three or four times, she did testify to more significant personal interaction with Salimonu than Petrosino had described. McKinnon testified that she met Salimonu shortly after Perry had begun recruiting her and that she rode around in a car with Perry and Salimonu for an hour, when Salimonu told her that she could make a lot of money and repeatedly assured her that "everything was going to be alright." But it was Perry who told McKinnon when she was to travel, gave McKinnon her plane ticket, provided McKinnon with spending money for the trip, and paid for her hotel rooms. Although McKinnon testified that it was her understanding that Salimonu was reimbursing Perry for all the money she saw Perry spend in furtherance of the conspiracy, she got that impression mostly from what Perry told her. On the witness stand, McKinnon admitted that she had told the customs investigators an entirely different story (in her words, "a bunch of lies") during her initial interrogation.[16] McKinnon also admitted on the witness stand that she lied in an attempt to protect Perry (the father of one of her children).

The majority also emphasizes that the co-conspirators were consistent with one another even though they "apparently had no opportunity to communicate after their arrests." However, McKinnon was arrested on May 29, 1992 and flew to Chicago the next day (accompanied by U.S. Customs agents) in order to make a controlled delivery to Perry. Perry came to meet McKinnon at the airport on May 30, 1992 and from the time Perry met McKinnon (who had been under arrest for over a day at that point) until he was arrested in the airport parking lot, Perry and McKinnon were alone (although under visual surveillance) with a chance to communicate.

### 2. The Tapes of Phone Conversations

The prosecution introduced into evidence five taped phone conversations involving Salimonu, one of which involved Petrosino and four of which involved McKinnon. (A sixth tape involved McKinnon and Perry.) Petrosino and McKinnon were under arrest and cooperating with the U.S. Customs agents at the time of each of the calls. The call between Petrosino and Salimonu was not inculpatory. Petrosino attempted to draw Salimonu into a conversation about the conspiracy but Salimonu simply responded with confusion. It is undisputed that Petrosino had never called Salimonu in furtherance of the conspiracy; the U.S. Customs agents had to provide Petrosino with a phone number for Salimonu because Petrosino only knew how to contact Perry throughout the course of the conspiracy.

Three of four conversations between McKinnon and the man who was identified as Salimonu [17] were likewise benign. Salimonu is heard asking McKinnon how her trip was, helping to arrange McKinnon's flight from Boston to Chicago, and sympathizing with how much McKinnon misses her children. In their fourth conversation, Salimonu asks McKinnon: "[d]id they go through your stuff at all?" When McKinnon responds in the negative, Salimonu says: "Thank God." Of course, the jury could decide that it was in fact Salimonu on the tape and use this exchange as evidence of Salimonu's knowing participation in the conspiracy.

---

**16.** McKinnon's original story to the U.S. Customs agents was that she had been contacted by telephone by a man named Shawn Wilborough who asked her to go to Indonesia to transport Nigerian healing medicine. She further testified that Shawn had put her in communication with other co-conspirators whom she identified as Bobby, Billy, and Jim-my; she said that she did not know any of the co-conspirators' real names and had only spoken to them over the telephone.

**17.** The defense challenged whether it was in fact Salimonu on the taped phone conversations and presented expert testimony that the voice on the tapes was not Salimonu's.

### 3. *The Evidence from the Search*

The evidence seized during the warrantless search and ultimately admitted into evidence includes (1)the Foley Shomuga phone card and travel records, and (2)multiple cellular phone records. The former led the government to Angela Nash who testified that Laddie had asked her to get a cellular phone in her name for his use. *See Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (noting that the exclusionary rule applies to evidence gained during a search or as a direct result of a search and applies to physical as well as verbal evidence). The jury could have used the Angela Nash testimony to ascribe guilty motives to Salimonu's deceptive acquisition of a cellular phone using a non-conspirator's identity. Nash was the only non-conspirator fact witness to testify to such suspicious activity on the part of Salimonu, and the government argued her disinterested credibility to the jury.

The Foley Shomuga evidence corroborated Petrosino's testimony. Petrosino testified that "Foley" had given him cash to buy his plane ticket and, at a later date, cash for his trip. It is true, as the majority notes, that the prosecution had also discovered independently of the search and had placed into evidence a letter from Salimonu to a former landlord in Atlanta establishing that Salimonu knew a person named Foley. But the phone card seized from Salimonu's apartment and admitted into evidence put Foley in Salimonu's apartment *in Chicago* and also allowed the government to subpoena Shomuga's travel records from Salimonu's travel agent. Until the warrantless search, the police had no surname for Foley. Those records, which revealed Foley's travel between Chicago and Atlanta (a city in which other evidence showed Salimonu had shared an apartment with Foley), along with the Foley Shomuga phone card in Salimonu's

apartment, provided a key link between Petrosino's testimony that "Foley" provided him with money for the conspiracy and the government's theory that Salimonu was the conspiracy's organizer.[18] Although the majority minimizes this evidence, claiming that it did not "ha[ve] any significance to the government's case," it clearly enhanced Petrosino's credibility.

Angela Nash's testimony also established a foundation for admission of the cellular phone records which were in her name but which, according to her testimony, reflected Salimonu's use of the cellular phone. Although other evidence established that Salimonu knew Perry and McKinnon, the cellular phone records provided a documentary basis for arguing that Perry and McKinnon had truthfully described their involvement with Salimonu in drug trafficking. Perry's appointment book had multiple references to Salimonu with an "HC" next to them. Perry himself testified that these were references to haircut appointments. Fifty-seven phone calls, however, from Salimonu to Perry, and another fourteen to the motels where McKinnon was staying with Perry, altered the evidentiary landscape significantly, and substantially corroborated Perry's and McKinnon's account of their relationship with Salimonu.

The government emphasized the significance of the phone records by preparing poster-size enlargements of summaries of them so that the jurors could give them extra attention. Then, in its argument to the jury, the government continuously urged the jury to rely on the phone records as evidence of the conspiracy and corroboration of the credibility of the government's witnesses:

> We know that [Salimonu convinced Angela Nash to get him a phone in her name] a couple of ways. We know that, number 1, she told you. We know that, number 2, because the contract for that

---

18. The jury did not have to find that Salimonu was the leader of the conspiracy in order to find him guilty. However, this leadership theory was advanced by the prosecution during the presentation of the evidence and arguments to the jury.

phone was found in his apartment. Remember that? The search in September of 1993 revealed the service contract in the name Angela Nash for that telephone, 3152877.

And as exhibits in this case, ladies and gentlemen, as Exhibits 90, 91, and 92, you're going to have the phone charts. They are summaries of the Cellular One telephone records. Look at them.

\* \* \* \* \* \*

You have the [phone] records, you can analyze them. But what do they show, ladies and gentlemen? They show—I can get the numbers here—some 57 telephone calls from the cell phone that [Salimonu] had in Angela Nash's name to Christopher Perry in that one six-week period.

But more than that, they corroborate Christopher Perry, and they corroborate Kim McKinnon, because they show seven calls to the Day's Inn where Kim McKinnon was being housed and fed, and they show some seven calls to the Kitchenette Hotel where she moved . . .

\* \* \* \* \* \*

What we have now is Cellular One corroborating Christopher Perry and Cellular One corroborating Angela Nash, who in turn corroborates Christopher Perry . . .

\* \* \* \* \* \*

And then where does this great conspiracy of Chris Perry [wrongly implicating Salimonu] reach? It reaches into the—the tentacles go into the Cellular One Telephone Company. They reach out to Angela Nash.

\* \* \* \* \* \*

Now, try hard as he might, [defense counsel] can't cover-up the evidence that does show [Salimonu's] guilt. Do you remember the 57 telephone calls to Chris Perry, either to his mother or to the beeper, and then the additional ones to the Day's Inn and the Kitchenette Hotel? What do you think Laddie's call-ing Chris Perry for? I want to confirm my haircut for six weeks from now. But I'll call you again in an hour. But let's just make sure we know. 57 times? Holy Moses. Get away.

These multiple exhortations by the prosecutor that the jury should rely on the phone records reflect the government's awareness that corroborating the testimony of the co-conspirators was critical to its case. All of the main witnesses in the case—Perry, McKinnon, and Petrosino—had plea bargained in exchange for their testimony and had other credibility issues. Although the jury could believe them without the corroborative evidence obtained through the search of Salimonu's apartment, that evidence significantly enhanced the credibility of the co-conspirators. Hence the government repeatedly emphasized the importance of the phone records to the jury in its closing arguments.

It is an inescapable fact that "[t]he force of a prosecutor's argument can enhance immeasurably the impact of false or inadmissible evidence." *Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir.1991). That enhancement is particularly significant when the prosecution uses illegally seized corroborative evidence to remove reasonable doubts from the government's case. I therefore cannot conclude beyond a reasonable doubt that the evidence gained from the unconstitutional search of Salimonu's apartment did not affect the jury's verdict. I would vacate that verdict and remand for a new trial.